# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANNETTE MARTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-01026-TWP-MPB |
| | ) | |
| GENENTECH USA INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Genentech USA Inc. ("Genentech") (Filing No. 36). Plaintiff Annette Marton ("Marton") filed this lawsuit after she was terminated from her job at Genentech. She asserts claims for, among other things, wrongful and retaliatory termination and violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"). Genentech filed its Motion for Summary Judgment, asserting that Marton cannot support her claims with admissible evidence, and thus, summary judgment is appropriate. For the following reasons, the Court **grants** Genentech's Motion.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Marton as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Marton began working for Roche Laboratories ("Roche") on January 2, 1997 as a pharmaceutical sales representative. In 2009, Genentech and Roche combined their United States

pharmaceutical operations under the Genentech name. After this merger, Marton became a Genentech employee with the job title "senior clinical oncology specialist". Her duties included representing certain Genentech products to oncologists within her territory. The specific products Marton was responsible for promoting in the geographical area she covered changed throughout her employment. Marton was an exemplary employee from the beginning of her employment with Roche and Genentech, earning awards and accolades for performance and professionalism. From 1998 through 2012, she was given positive reviews every year of her employment with Roche and Genentech. At all times during her employment, Marton was an at-will employee (Filing No. 46 at 3; Filing No. 38-1 at 4-5, 7-8; Filing No. 38-2 at 1-2).

In late 2010, Marton applied for a position marketing Genentech's Herceptin product as part of the HER2 team. In March 2011, division manager Brent Kiff ("Kiff") hired Marton to fill the role of senior clinical oncology specialist on his team within Genentech's HER2 franchise. In this role, Marton was responsible for promoting cancer treatment drugs Herceptin, and later Perjeta and Kadcyla, in the Northern Indiana territory that spanned most of the area from Carmel up to South Bend and Michigan City and over to Lafayette. Other Genentech employees worked within the Northern Indiana territory, each promoting different products and reporting to different supervisors. Marton reported to Kiff and was expected to work with colleagues within her territory and specifically with her HER2 franchise counterpart, Barb Malone ("Malone"). As a division manager, Kiff was responsible for coaching and managing the work of his team members, including Marton (Filing No. 46 at 3; Filing No. 38-2 at 1-2, 4; Filing No. 38-1 at 8-9, 39, 46, 58).

In September 2011, Kiff observed Marton working in the field, and he generated a field report praising the quality of her work. He also noted a few areas that could be improved (Filing No. 46 at 4, 38-41). In October 2011, Marton participated in Genentech's training program for her

new position, and she received the highest grade in the training course as well as positive evaluations from the course instructors (Filing No. 46 at 5, 42-47). In November 2011, Kiff again observed Marton working in the field, and he generated yet another field report, which noted some positive feedback as well as a few areas for improvement (Filing No. 38-2 at 60-63).

In the fourth quarter of 2011, Kiff observed that Marton's behavior was difficult to manage and her performance was inconsistent. In late 2011, Kiff and Martin were at a HER2 product launch meeting, and while Marton was working with a physician/customer, she became overly aggressive. In response, the physician/customer became angry toward Marton, made a scene, and demanded that Marton be terminated. Kiff spoke with Marton about the incident immediately after the meeting, and he also began to coach her on communication and relationships with others. Following this meeting, Kiff started to have concerns about Marton's ability to communicate with colleagues and customers (Filing No. 38-2 at 2, 30–31).

In early 2012, Kiff gave Marton her annual performance review for 2011. He rated Marton's performance as "fully met expectations." Additionally, Kiff provided a number of positive comments regarding Marton being a part of the team and doing great work to help the team exceed its goals. He encouraged her to look for more opportunities to provide greater leadership to help evolve the HER family culture in a positive direction and to make progress toward better working relationships and including other team players (Filing No. 46 at 7; Filing No. 38-2 at 14–20).

In June 2012, Kiff again observed Marton working in the field and generated a field report. Kiff noted that Marton was number three in the country and that she had developed a strong relationship with a particular doctor's office. He noted one area for improvement, and he also asked Marton to be more positive around her peers. Kiff asked her to balance her negative

comments with positive comments to help with the long-term success of the team (Filing No. 38-2 at 64–66).

During Marton's 2012 mid-year review, which Kiff delivered during the third quarter of 2012, Kiff tried coaching Marton on improving her communication and collaboration skills. Kiff perceived Marton's response to his feedback to be aggressive, verbally abusive, and agitated, which was something he had never experienced as a manager (Filing No. 38-2 at 3). Kiff again observed Marton working in the field and wrote a field report in September 2012. Kiff noted Marton's sales success but asked her to continue working on transitioning into the HER2 team (Filing No. 46 at 48–50). Marton ended up being the top sales representative in the country for Genentech in 2012. *Id*. at 9.

On February 21, 2013, Kiff gave Marton her annual performance review for 2012. He rated Marton's performance as "exceeded expectations." Kiff provided a number of positive comments, especially about Marton's sales success. He encouraged her to be more positive and to expand her network within the HER2 team. Kiff again requested that Marton work on her communication skills and accept his coaching. Marton disagreed with Kiff's rating of "exceeded expectations," believing the rating should have been "outstanding performance." Marton was argumentative with Kiff about the rating (Filing No. 38-2 at 3, 21–27).

Four days later, on February 25, 2013, Kiff reached out to his manager Naomi Jaszewski ("Jaszewski") regarding his concerns about Marton and how she had responded during the annual review meeting. Kiff and Jaszewski decided to elevate the situation to the human resources department, so Kiff emailed senior employee relations manager Tamara James-Ishibashi ("James-Ishibashi") to set up a meeting. The three discussed how to manage Marton and decided that Kiff would continue to proactively coach Marton on her communication and collaboration skills (Filing

No. 38-2 at 3–4; Filing No. 38-6 at 1; Filing No. 38-3 at 2).  Thereafter, Kiff continued to seek out guidance from Jaszewski and James-Ishibashi on how best to manage Marton.

On August 15, 2013, Kiff reached out to James-Ishibashi to discuss a situation that occurred with Marton during her 2013 mid-year review where she responded negatively to coaching that was being delivered. In November 2013, Kiff worked with Jaszewski and James-Ishibashi to prepare for a meeting with Marton where he was going to coach her on teamwork, collaboration, and communication. And in February 2014, Kiff worked with Jaszewski and James-Ishibashi to prepare for Marton's 2013 performance review (Filing No. 38-2 at 4, 32, 34–36; Filing No. 38-3 at 2).

Marton acknowledged that 2013 was a challenging year, following a very successful 2012. In the fall of 2013, Marton discovered a Genentech reporting error with one of her largest accounts. As a result of the error, Marton did not receive credit for significant sales of Genentech products, which had a large impact on her performance in relation to her sales goals for the year. When Marton brought the issue to Kiff's attention, he did not do anything about it. However, in Marton's 2013 performance review, Kiff noted that he submitted an inquiry, which revealed that Marton was getting credit on her account. The 2013 performance review noted positive things accomplished by Marton, but it also noted the ongoing need to be positive and to work on collaboration and teamwork. Kiff encouraged Marton to move on from the disappointment she had about not being able to attend a national meeting to receive her 2012 sales award because the meeting coincided and conflicted with their team's launch of a new product. In the performance review, Kiff asked Marton to be open to feedback and to take ownership and accountability to change. Kiff rated Marton's overall performance as "partially met expectations," while Marton

disagreed and rated herself as "fully met expectations." Marton again was argumentative about her rating (Filing No. 38-1 at 63; Filing No. 46 at 26; Filing No. 38-2 at 5, 37-50).

Marton's 2014 annual performance review noted that collaboration and communication within the HER2 team and with Kiff were important areas where improvement was needed. The review noted that Marton had made some progress, but there was still substantial work to be done. Kiff further noted that Marton brought value to customers and the team because of her experience and expertise, and mentioned her good sales performance for the year. Kiff explained in the review that Marton needed to be open to feedback, and he rated her annual performance as "fully met expectations." (Filing No. 38-2 at 54–59.) Feedback from Marton's work colleagues in 2014 also reflected teamwork and communication challenges. Marton's peers noted that she was abrasive and negative, instigated problems, lacked empathy, gave destructive criticism, lacked credibility, and had to be approached cautiously. *Id.* at 83–84.

In her role as a sales representative, Genentech instructed Marton regarding the patient types that would not fall within the anticipated FDA approval labels for Perjeta and Kadcyla and how to persuade physicians to prescribe Perjeta and Kadcyla in these cases. Genentech also directed Marton to promote the use of Perjeta and Kadcyla to healthcare providers prior to their FDA approvals. In early August 2012, less than two months after Genentech received the initial FDA approval for Perjeta, Genentech instructed Marton to encourage providers to use miscellaneous J-codes to ensure Medicaid reimbursement, which obscured how the Genentech products actually were being utilized. Genentech directed Marton to market the Genentech products to healthcare providers for off-label uses from August 2012 through at least March 2016 (Filing No. 46 at 14–16).

During that same time period of August 2012 through March 2016, Genentech also instructed Marton to promote off-label use of the Genentech products by offering healthcare providers prominent speaking engagements for which they would be generously compensated. The physicians chosen as speakers typically wrote a significant number of prescriptions for the Genentech products. The speakers were selected as a result of nominations by Genentech's sales representatives, including Marton, and selections were based on the speakers' volume of Genentech prescriptions or their status as potentially lucrative sales prospects, rather than their experience or expertise within their field of practice. Genentech encouraged the speakers to downplay the significance of possible side effects resulting from the use of the Genentech products for both approved and off-label purposes. The speaker would use a presentation provided by Genentech that covered approved uses of the Genentech products. Genentech encouraged the speaker to discuss the off-label uses of the Genentech products when the speaker was asked questions. Genentech instructed Marton to ensure that attendees would ask questions that would lead to discussion of off-label uses of the Genentech products.

For her part, Marton refused to plant questions as directed by Kiff. On one occasion, she reported a speaker's promotion of off-label use of Genentech products to Genentech's internal compliance department, and she was told to ignore it. *Id.* at 16–18.

During the time period of August 2012 through March 2016, Genentech also instructed Marton to direct site of care, influencing physicians' decisions regarding the choice of hospital facilities and encouraging referral to hospitals or other institutions that would utilize miscellaneous coding to ensure Medicare reimbursement for the use of the Genentech products for off-label uses. *Id.* at 19.

In August 2011, soon after Marton joined Kiff's team, Kiff hosted a party for the team in New Buffalo, Michigan. For the party, Kiff rented a luxury yacht and provided each team member with a large gift basket, an expensive dinner, and other extravagances. Then in December 2011, Kiff provided his team with a Christmas party at the Trump Hotel in Chicago, Illinois. He provided each team member with an expensive hotel room and gifts. In August 2012, at a division meeting in New Buffalo, Michigan, Kiff again rented an expensive yacht for his group to use for a social outing. Marton believed that this was a compliance violation because she thought that Kiff had exceeded his permissible expense limitations. Later that night, Kiff sought to offset the expense of the yacht rental, so he directed Marton to put the entire bar bill from the event on her own expense report, misrepresenting that it was for her dinner. Marton refused to present a false expense report and reminded Kiff that this sort of thing violated Genentech's corporate policies. Kiff responded angrily, so Marton paid the entire bar bill out of her own pocket (Filing No. 46 at 23).

On January 7, 2013, Kiff arranged for his entire division to go skiing while attending a meeting near Salt Lake City, Utah. Kiff lost his ski lift ticket, so Marton suggested that all the group members chip in to buy Kiff a new lift ticket, but Kiff declined the offer. Also in January 2013, Kiff threw another party for his group at a hotel in Chicago. He arranged for all members of the group to have expensive hotel rooms for themselves and a guest, and he also arranged for a large suite for the party and later provided it to one of the group members for personal use. *Id.* at 23–24.

On June 13, 2013, after numerous instances of Kiff directing Marton to market and sell the Genentech products for off-label use, direct site of care, promise physicians financial rewards for using Genentech products, and misrepresent expenses on reports, Marton contacted Genentech's internal compliance department and reported these incidents. Marton provided the details of Kiff's

activities in writing and by telephone. This was the first time that Marton had made a report regarding Kiff. *Id.* at 24.

Marton was very concerned that Kiff would retaliate against her if he learned that she had reported him. However, she decided to go forward with her report when Genentech's internal compliance representative assured her that the investigation would be conducted confidentially. From June 14 through 24, 2013, Marton supplied Genentech's compliance department with additional written details and documentation regarding promotion of off-label use of the Genentech products, direction of site of care, kickbacks to healthcare providers, and written misrepresentations in expense reports. *Id.* at 24–25.

In July 2013, Marton received a voicemail from Genentech's compliance department, advising her that an investigation of Kiff was underway. She was not directed to keep the investigation confidential or to refrain from discussing it with other employees. Soon thereafter, Marton learned from colleagues that they had received the same voicemail and that a few of her colleagues had alerted Kiff of the investigation. Marton immediately contacted Genentech's compliance department, expressing fear of retaliation by Kiff who was actively trying to determine who had reported him to Genentech's compliance department. *Id.* at 25.

In the summer of 2013, Kiff was notified by the compliance office of an anonymous complaint lodged against him concerning violations of the company's policies including expense reporting. Kiff cooperated with the investigation, and at that time, he did not know who raised the complaint (Filing No. 38-2 at 7).

On September 23, 2013, Kiff and several members of the team consumed mid-day alcoholic beverages while at a meeting. Kiff directed Marton, who had not been drinking, to pay for the entire tab and misrepresent that the expense was just for lunch. Marton felt frightened and

intimidated by Kiff, yet she expressed reluctance to comply with Kiff's demand. Kiff immediately became angry. He shouted and cursed at Marton, humiliating her in the presence of her coworkers, other restaurant patrons, and the restaurant staff (Filing No. 46 at 25–26).

On October 10, 2013, Marton received an email from Genentech's compliance department, thanking her for reporting her concerns and advising that the investigation was complete. The email further advised that the compliance department had taken appropriate action to ensure that company policies and all applicable laws and regulations were being followed. *Id.* at 26. It was determined that Kiff's expense reporting violations were minor but the other allegations against him were unsubstantiated. Kiff was given verbal coaching for the expense reporting issues (Filing No. 38-2 at 7; Filing No. 38-4 at 3).

On November 15, 2013, Kiff emailed Marton, asking that they meet to discuss a couple of things. He suggested meeting halfway, somewhere in Merrillville or Plymouth, Indiana. They agreed to meet in Michigan City, which would require Marton to cancel a business appointment that had been difficult to schedule and drive more than 300 miles round trip to meet with Kiff. When Marton asked what they would be discussing so she could prepare, Kiff responded that there was nothing to prepare for, just that some things had come to his attention (Filing No. 47 at 5–6; Filing No. 46 at 26).

In light of Kiff's treatment of Marton, as well as multiple telephone calls during which Kiff used profanity and belittled Marton in a raised voice, she was very uneasy about meeting with Kiff alone. On November 18, 2013, Marton again contacted Genentech's compliance department and explained that she felt she was being retaliated against and that the investigation had not been conducted in a confidential manner. Marton was directed to contact employee relations,

specifically James-Ishibashi, with any concerns about retaliation (Filing No. 38-4 at 24–25, Filing No. 46 at 26–27).

On November 20, 2013, Marton canceled her business appointment and drove over 150 miles to meet with Kiff in Michigan City. To begin their meeting, Kiff explained that Marton was "not being fired today," making a thinly-veiled threat to Marton's job and making Marton feel threatened and intimidated. In a loud and aggressive manner, Kiff questioned Marton about saying negative things about him, and Marton perceived that this was in reference to the compliance investigation that followed her report to the compliance office. Kiff demanded that she stop saying negative things about him, and he threatened her job if she did not stop (Filing No. 46 at 27; Filing No. 38-2 at 34–35; Filing No. 38-1 at 10, 24, 52).

Throughout 2013 and into 2014, Kiff continued to contact Marton on a regular basis, belittling her, threatening her job, and using profanity. He threatened to demote her with a change of title from senior clinical oncology specialist to clinical oncology specialist, which would have impacted her compensation. In January 2014, Marton reached out to Jaszewski, Kiff's supervisor, and explained that Kiff had been retaliating against her and that she feared for her job (Filing No. 46 at 27). And in February 2014, Marton reached out to Jaszewski to have a conversation in preparation for her upcoming annual review (Filing No. 38-6 at 8). Although she felt that she was subjected to a lot of harassment throughout 2014, Marton did not complain about it to Genentech between the spring of 2014 and the spring of 2015 (Filing No. 38-1 at 30).

In January 2015, Marton expressed to Kiff her concerns that one of her colleagues had behaved in an unreliable, unprofessional manner, and they had violated compliance rules. Kiff disregarded Marton's concerns and responded that it would not go well for Marton if Kiff had to look into the matter. Throughout early 2015, Kiff continued to shout at Marton in their interactions,

use profanity, and threaten to take action against her. On May 5, 2015, Marton again requested Kiff's assistance in dealing with her colleague's lack of communication and professionalism and compliance violations. Kiff again responded that it would not go well for Marton if he had to get involved (Filing No. 46 at 29).

Around May 19, 2015, Marton consulted with a medical provider, Dr. Knowles-Duncan, for the first time for stress and anxiety. Marton was experiencing this stress because of Kiff's treatment of her at work. Dr. Knowles-Duncan placed Marton on emergency medical leave around May 20 or 21, 2015. Marton filled out the necessary FMLA paperwork, and Genentech approved her FMLA leave. She was provided short-term disability benefits that were coordinated by Genentech's benefits provider, Liberty Mutual (Filing No. 38-1 at 32, 66, 68; Filing No. 46 at 29; Filing No. 38-7 at 1–2, 8–9).

Marton's FMLA leave entitlement was exhausted on July 27, 2015. Marton returned to work from her leave more than two months later on October 19, 2015. Marton had two restrictions in place upon her return: a limitation of 40 hours per work week and no overnight travel for 60 days. Marton communicated both of these restrictions to Kiff upon her return; however, Kiff disputed this assertion, stating that Marton did not communicate her restrictions to him, and Liberty Mutual's correspondence did not include the 40-hour restriction (Filing No. 38-7 at 1–2, 12; Filing No. 38-1 at 35; Filing No. 38-2 at 8, 90–99).

On October 19, 2015, Marton's first day back from leave, she repeatedly tried to contact Kiff asking for his assistance in transitioning back to work. Kiff responded with a text message that evening, apologizing for missing her call and explaining that it had been a crazy week. He asked Marton where she would be working that week so that they could meet in person and talk about how he could support her with her transition back to work (Filing No. 46 at 30; Filing No.

38-2 at 103). Over the next few days, Kiff and Marton exchanged emails and telephone calls trying to arrange a field visit, with Kiff providing some resources to help Marton with her return to work (Filing No. 38-2 at 104–06). They were able to arrange a face-to-face meeting for the morning of October 29, 2015, in Merrillville. *Id.* at 107. During her first two weeks after returning from medical leave, Marton had to work approximately sixty hours per week to accomplish the tasks assigned by Kiff (Filing No. 46 at 31).

On October 26, 2015, a week after returning to work, Marton requested a number of vacation days. Two days later, on October 28, 2015, Kiff approved two vacation days but postponed approval of Marton's request for vacation days over the Thanksgiving holiday despite Genentech's benefits department already notifying her that she had vacation days to use or she would lose them. Kiff explained that he, Jaszewski, and the HR department wanted to see how Marton was progressing with her return to work before approving the vacation time off. Because Marton did not get an immediate approval, she canceled airline and hotel reservations that she had made. On November 10, 2015, Marton followed up with Kiff about the time-off request, and the following day, Kiff responded, approving her request. At that point, Marton already had lost out on her previous travel arrangements and could not replace them at a reasonable cost (Filing No. 38-2 at 111–12; Filing No. 46 at 31).

On November 3, 2015, Marton contacted the HR department and left a voicemail message, explaining that her health was deteriorating as a result of Kiff requiring her to work nearly sixty hours per week despite her work restrictions and the agreed-upon accommodations. Marton did not receive a response (Filing No. 46 at 32).

On November 12, 2015, Kiff was working with Marton in the field, and he began to present Marton with her 2015 mid-year review. Kiff explained that Marton was trending toward a

"partially meets expectations" review and discussed the need to work on teamwork and collaboration. Marton responded by deflecting the comments and not accepting responsibility, pointing the finger at her coworker/counterpart Malone. Feedback from Marton's colleagues for 2015 reflected similar concerns, such as that she operated on the fringe, people had to walk on eggshells when interacting with her, she was threatening in the workplace, and they tried to limit their interactions with her (Filing No. 38-2 at 9, 75–77, 81–83, 116; Filing No. 46 at 32).

On December 10, 2015, Marton advised Kiff that she would be taking vacation days on December 18 through 22, 2015, to visit her ailing parents in Pennsylvania. *Id.*  The next day Kiff requested Marton's schedule for the rest of the year to arrange working with her in the field. Because Genentech closes for the year on December 24, Marton's only remaining workdays for 2015 were December 11 through 18 and 23. *Id.* Four days later, on December 15, 2015, in response to Kiff's request, Marton told Kiff that she would be available to work with him in the field on December 18 and 23, 2015. Kiff did not show up on December 18, 2015, but rather, he called Marton in the afternoon. He was hostile and complained that Genentech's legal department was now involved in Marton's return to work and her work accommodations. Kiff told Marton that he would work with her on December 23, 2015. Marton left early from her holiday vacation to prepare to work with Kiff. When December 23, 2015 arrived, Kiff canceled their meeting at the last minute, sending a text message to Marton that explained he was still waiting on some information, so it did not make sense for them to get together (Filing No. 46 at 32–33; Filing No. 38-2 at 121–22).

On December 11, 2015, Marton received a telephone call from a Genentech HR representative after normal business hours. Marton explained that she already had far exceeded her forty-hour workweek restriction, but the HR representative insisted on speaking right then, and the telephone call lasted more than an hour. During the telephone call, the HR representative and

Marton discussed issues related to her return to work. Marton complained that Kiff was retaliating against her for lodging the compliance complaint and for taking medical leave. On December 15, 2015, Marton followed up with the HR representative, documenting that Kiff was requiring her to work more than forty hours per week and advising that Kiff's retaliation was causing her health problems (Filing No. 46 at 32–33).

On January 5, 2016, Marton raised complaints with Genentech's HR representative and the chief compliance officer, explaining that she believed Kiff was retaliating against her because of her report to the compliance department. Marton pointed to a number of incidents that she characterized as retaliatory in nature. She complained that Kiff did not call her back right away, failed to comply with her medical restrictions, criticized her for not working while on medical leave, did not give her enough time or help, gave her unjustified negative reviews, threatened termination, and asked her to attend inconvenient meetings. Throughout the following days, Marton provided additional information and materials to Genentech's HR department (Filing No. 38-7 at 15–18; Filing No. 46 at 34).

Genentech investigated Marton's complaints about the return to work accommodations and Kiff's retaliation. Danielle Zelinski ("Zelinski"), Genentech's HR representative, focused on Marton's allegations related to her medical restrictions not being honored. Zelinski ultimately concluded that there had been a miscommunication from Liberty Mutual regarding the work accommodations. James-Ishibashi focused on Marton's allegations about Kiff's retaliation. James-Ishibashi interviewed Marton, Kiff, and several of Marton's colleagues. James-Ishibashi was not able to substantiate Marton's allegations that Kiff was retaliating against her for any reason. Rather, James-Ishibashi concluded that Kiff had tried to help Marton. Genentech ultimately concluded that Marton's allegations could not be substantiated, and James-Ishibashi emailed a copy of her

investigation memorandum to Marton on February 29, 2016 (Filing No. 38-1 at 49–51; Filing No. 38-7 at 2–3; Filing No. 38-3 at 2–3, 5–10).

Kiff sought input from Jaszewski, his manager, and Kim Bailey ("Bailey"), HR manager, for preparing the contents of Marton's 2015 annual review. He also worked with senior employee relations manager, James-Ishibashi, for scheduling a location for Marton's annual review meeting because Marton had complained about driving to the proposed location in Michigan City. Kiff coordinated the meeting location and time with Marton, and they met on March 2, 2016, at a Starbucks on the north side of Indianapolis (Filing No. 38-2 at 10–11, 124–30, 133).

Kiff began to give Marton her 2015 annual performance review. During the meeting, Kiff gave Marton a negative performance review, which would result in significant financial consequences for Marton. Kiff perceived that Marton was visibly unhappy, hostile, and upset. She again raised issues about her coworker/counterpart Malone, handing Kiff documents and complaining about Malone's performance and behavior. Marton also disputed Kiff's feedback on her performance (Filing No. 38-2 at 11; Filing No. 38-1 at 55; Filing No. 46 at 34).

In describing the meeting, Kiff reports that Marton was verbally and physically aggressive and unwilling to receive coaching. Specifically, Marton pointed her finger in Kiff's face and put her hand on his computer. He decided that the meeting was not productive, so he called it to an end. As Kiff and Marton were heading toward the door, Marton said something to the effect of "if you're going to come after me, I'm going to come after you." Marton then walked to her car, and as Kiff walked toward his car, he heard a voice call over his shoulder, "stay away from Annette." When Kiff turned around, he saw a man exiting the Starbucks and walking toward Marton's car. Kiff felt threatened by these statements. He immediately spoke to a police officer who was in the parking lot and then visited a local police department to file an incident report with the Indianapolis

Metropolitan Police Department. Kiff also contacted Jaszewski, Bailey, and Genentech's Global Security department to discuss the incident and to seek guidance for next steps (Filing No. 38-2 at 11–12).

Marton described the meeting differently: While she was disappointed with the annual review, she did not raise her voice at Kiff, did not pound the table, did not shove Kiff's computer, and did not make any remotely aggressive gesture or touch Kiff in any way. Marton denied telling Kiff that "if you come after me, I'll come after you." She simply received her performance review, asked a few questions, and quietly left the meeting. As the meeting ended, she gathered her belongings, walked to her car, and drove home (Filing No. 46 at 35).

Genentech later informed Marton that Kiff had claimed that, shortly after their meeting, someone approached him in the parking lot and warned him to leave Marton alone. Marton knew nothing about this incident and did not threaten Kiff or instruct anyone else to do so. *Id.*

Kiff provided to Bailey and Jaszewski copies of the report information, the police officer's business card, photographs, and an email from Kiff's former colleague who witnessed the meeting at Starbucks. Bailey, with some involvement from Jaszewski, investigated the incident, concluded Marton had engaged in inappropriate conduct toward Kiff, and believed this was terminable behavior. Jaszewski, with approval from her manager, decided Marton would be terminated and notified Marton of her termination on March 9, 2016. Kiff was not involved in the termination decision (Filing No. 38-2 at 12; Filing No. 38-5 at 3–4, 19–29; Filing No. 38-6 at 4, 15–18; Filing No. 38-3 at 3). Marton was notified of her termination via a telephone call, wherein she was told she was terminated because she had threatened Kiff during the Starbucks meeting (Filing No. 46 at 35).

17

On March 6, 2018, Marton filed this lawsuit against Genentech in state court (Filing No. 1-1 at 2). On April 3, 2018, Genentech removed the action to this Court (Filing No. 1). Marton amended her Complaint (Filing No. 22), and Genentech moved to dismiss some of Marton's claims (Filing No. 23). The Court granted in part and denied in part the motion to dismiss, dismissing Marton's False Claims Act claim and her claims for defamation and intentional infliction of emotional distress and leaving intact her FMLA and wrongful and retaliatory termination claims (Filing No. 32). Then Genentech filed its pending Motion for Summary Judgment on the FMLA and wrongful and retaliatory termination claims (Filing No. 36).

## II.        SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*,

476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Marton as the non-moving party and draws all reasonable inferences in her favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9.

### III.   DISCUSSION

Genentech asks for entry of summary judgment on Marton's two remaining claims: wrongful and retaliatory termination and violation of FMLA. The Court will address each claim in turn.

### A.   Wrongful and Retaliatory Termination

In Count II of her Amended Complaint, Marton brings a state law claim for wrongful and retaliatory termination. In the Entry on Defendant's Partial Motion to Dismiss, the Court allowed this claim to proceed but explained,

> Indiana is an at-will employment state, only allowing for wrongful termination if
> there is (1) a contract; (2) "a clear statutory expression of a right or duty [that] is
> contravened"; or (3) promissory estoppel. *Orr v. Westminster Village North, Inc.*,
> 689 N.E.2d 712, 718 (Ind. 1997). Only the second exception to the at-will doctrine
> would seem to apply here . . . . [T]he Court reminds the Plaintiff that in order to
> ultimately succeed on her claim, she will have to "demonstrate[] a statutory source
> for the alleged right [s]he claims to have exercised" or "a statutory source for the
> duty [s]he claims to have fulfilled." *Campbell v. Eli Lilly & Co.*, 413 N.E.2d 1054,
> 1061 (Ind. Ct. App. 1980).

(Filing No. 32 at 3–4.)

In moving for summary judgment, Genentech asserts that Marton cannot support this claim

which requires her to show (1) she was discharged (2) because of (3) a refusal (4) to commit an

illegal act for which she would have been personally liable. *McClanahan v. Remington Freight

Lines, Inc.*, 517 N.E.2d 390, 393 (Ind. 1988).

Genentech argues that Marton did not oppose illegal conduct or refuse to engage in illegal

conduct. She has not identified a statute making Kiff's conduct or requests illegal. Kiff's expense

reporting conduct (to which Marton points) may have violated Genentech's internal policies, but

no illegal activity was opposed. Genentech asserts that, because she did not oppose or complain

about unlawful conduct as required to state a claim for wrongful termination under Indiana law,

Marton's claim must be dismissed on summary judgment.

Furthermore, Genentech argues, Marton cannot show that she was terminated "because of"

her opposition to Kiff's conduct and requests. There is no evidence that anyone at Genentech other

than Kiff had any reason to retaliate against Marton. Yet Kiff did not make the decision to

terminate Marton's employment. Additionally, Marton was concerned about Kiff's conduct starting

in August 2011, and she first raised her formal complaint in June 2013. She was not terminated

until March 2016. And Kiff started coaching Marton about communication and teamwork issues

in November 2011, well before Marton opposed Kiff's conduct. Genentech argues there is no

causal connection between Marton's opposition to Kiff and her termination, and Kiff did not make the termination decision.

Genentech also asserts that it had a legitimate reason for terminating Marton—the Starbucks incident. While Marton asserts that she had no involvement in threats to Kiff, Genentech argues there is no evidence to contradict that Bailey conducted an investigation into the incident and concluded that Marton's conduct warranted termination, and Jaszewski, with approval from her manager, decided to terminate Marton because of the Starbucks incident. Because there is no statutory right or duty to support Marton's wrongful termination claim and no causal connection between her firing and her opposition to Kiff, Genentech argues the claim must be dismissed.

In response, Marton asserts that Kiff repeatedly demanded that Marton submit false written statements for expense reimbursement from Genentech, and had she complied, she could have been held personally liable for criminal deception. *See* Ind. Code § 35-43-5-3(a)(2). She asserts that this conduct could have also exposed her to liability for criminal mischief. And she would have been exposed to civil liability pursuant to Indiana's crime victim's relief act, Ind. Code § 34-24-3-1. Furthermore, Marton argues, Kiff directed her to promote off-label use of the Genentech products, direct site of care, and offer kickbacks to prescribing physicians. Marton asserts that, had she complied, she would have been exposed to criminal and civil liability for Medicaid fraud, Ind. Code § 35-43-5-7.1(a).

Marton argues the evidence shows a causal connection between her opposition to Kiff and her termination. She asserts that she refused to engage in conduct directed by Kiff, she ultimately reported Kiff's conduct to Genentech's internal compliance department, Kiff learned that she had reported his unlawful practices, and Kiff responded by creating a hostile working environment for Marton. Even after learning that Marton had reported his misconduct, Kiff continued to demand

that Marton engage in the conduct and verbally abused her when she refused to comply. Marton argues that it can be inferred that Kiff tried to create such a hostile environment that Marton simply would quit. When she did not quit, Marton argues Kiff made up the story about the Starbucks incident to get her fired. She argues there is a dispute whether the incident occurred, and Genentech participated in Kiff's fabrication. For example, Genentech explained to Marton that it had a police report for Kiff's complaint, yet it did not produce a police report in discovery.

Marton also argues that Genentech's argument is supported by inadmissible hearsay—Kiff's statements to police, an email from Kiff's former colleague, a threatening statement made by a man toward Kiff, and Bailey's conversation with a police officer. Because they are out-of-court statements, Marton argues that they cannot be used to support summary judgment. Marton concludes that disputes of material fact preclude summary judgment on this claim.

In reply, Genentech argues Marton's efforts to point to various Indiana statutes to support her claim are unavailing. There is no evidence that any false claims were actually submitted to violate Indiana's Medicaid fraud statute. Genentech explains that the Court already ruled in its Entry on Defendant's Partial Motion to Dismiss that Marton's False Claims Act claim had to be dismissed, and the same result applies to Marton's new Indiana Medicaid fraud claim. In any event, Genentech argues, even if Marton's Medicaid-related arguments can be considered, Indiana's statutory scheme provides Marton's remedy related to those claims, not an independent wrongful termination claim. Marton cannot maintain a wrongful discharge claim related to alleged Medicaid fraud because Indiana courts do not recognize an exception to at-will employment when the statute at issue provides its own "comprehensive remedial scheme, including a remedy for retaliatory discharge." *Davenport v. Indiana Masonic Home Foundation, Inc.*, 2004 WL 2278754, at *7 (S.D. Ind. Sept. 30, 2004). Indiana statutes provide just such a scheme and set of remedies. *See* Ind. Code

§ 5-11-5.5-8 (Indiana False Claims and Whistleblower Protection), and Ind. Code § 5-11-5.7-8 (Indiana Medicaid False Claims and Whistleblower Protection). Thus, Marton's sole cause of action related to Genentech's alleged Medicaid violations falls under the Indiana versions of the False Claims Act, which is barred because it was not previously raised in this lawsuit and is otherwise precluded based on the Court's dismissal of Marton's False Claims Act retaliation claim.

Concerning the expense reimbursement issue, Genentech notes that this issue involved internal company compliance violations, not criminal activity. The evidence shows Genentech undertook an internal investigation and determined that Kiff's expense-related conduct was a minor compliance violation for which he received verbal coaching. Genentech asserts that the conduct Marton opposed was not illegal and could not have exposed Marton to personal liability.

Regarding Marton's argument about inadmissible hearsay, Genentech replies that Marton is incorrect because the out-of-court statements are not presented to the Court for the truth of the matters asserted, but rather, to show that statements were made and the impact those statements had on Kiff (making him feel threatened and reporting the incident to police). Therefore, the evidence is not hearsay and may be considered by the Court.

Upon review of the designated evidence, the Court concludes that the evidence does not support Marton's state law claim for wrongful and retaliatory termination. Marton's refusal to comply with Kiff's directives concerning expense reporting and reimbursement, and her filing of an internal complaint against Kiff, did not expose Marton to personal criminal or civil liability. Genentech's internal compliance policies and discipline addressed Marton's concerns, and an Indiana statute did not apply to Marton's situation regarding internal expense reporting. Concerning Marton's claim based upon Medicaid fraud, Indiana Code §§ 5-11-5.7-8 and 5-11-5.5-8 provide the remedial scheme for employees who have suffered retaliatory discharge, and thus,

an Indiana common law wrongful or retaliatory discharge claim is precluded where the claim is based upon Medicaid fraud. *See Davenport*, 2004 WL 2278754, at *7. Because Indiana is an at-will employment state, and because Marton has not supported her common law claim with a statutory basis, Genentech is entitled to summary judgment on Marton's wrongful and retaliatory termination claim.

**B.**     **Violation of FMLA**

In Count III of her Amended Complaint, Marton brings a claim against Genentech for violating the FMLA. The FMLA prohibits an employer from discriminating against an employee who has used FMLA leave. *See* 29 U.S.C. § 2615(a); 29 C.F.R. § 825.220(c). "In order to prevail on a FMLA retaliation claim, a plaintiff must present evidence that she was subject to an adverse employment action that occurred because she requested or took FMLA leave." *Guzman v. Brown County*, 884 F.3d 633, 640 (7th Cir. 2018).

It is undisputed that Marton took FMLA leave from late May 2015 to late July 2015 and was terminated over six months later in March 2016. Genentech argues there is no evidence to prove that Marton's termination was motivated by or because of her FMLA leave. Genentech points out that Marton alleges Kiff mistreated her between her return from leave and her termination. It argues that none of those incidents can support FMLA retaliation because, according to Marton, Kiff was mistreating her beginning in 2012 – long before she took FMLA leave in 2015 and even longer before she was terminated in 2016. Thus, Kiff's mistreatment could not be related to Marton's FMLA leave.

Genentech contends that the post-leave events of which Marton complains are not materially adverse employment actions: that Kiff did not timely communicate with her, did not immediately approve her vacation request, yelled at her on the telephone, called her leave a

24

"vacation," failed to show up for their meetings, gave her negative evaluations and feedback, and did not respect her medical accommodations. *See Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) ("not everything that makes an employee unhappy is an actionable adverse action" and negative performance evaluations alone do not constitute materially adverse actions).

Genentech further argues there is no suspicious timing between Marton's FMLA leave and her termination. The evidence shows that Marton took FMLA leave from May 2015 to July 2015, she remained on disability leave until October 19, 2015, and then she remained employed with Genentech for over four months until she was terminated in March 2016. Genentech asserts there is no temporal proximity between Marton's FMLA leave and termination to suggest any causal connection. Furthermore, "timing alone rarely is sufficient to create a triable issue" or establish a genuine issue of material fact. *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009).

Genentech asserts that Marton was not meeting its legitimate employment expectations. She had inconsistent sales performance, her colleagues complained that she was difficult to work with, and her manager observed that she needed to improvement with communication and teamwork but failed to do so. These issues began long before Marton's FMLA leave and long before the Starbuck's incident. Genentech further asserts that Marton has presented no evidence that similarly situated employees who did not take FMLA leave were treated more favorably. Rather, Genentech honestly believed, after its own independent investigation of the March 2016 Starbucks incident, that Marton engaged in conduct worthy of termination. Genentech argues the evidence is clear that Marton's termination had nothing to do with her FMLA leave.

Marton responds by pointing out that the parties do not dispute she engaged in protected activity when she took approved FMLA leave. The entirety of her remaining argument is that,

> As discussed above, Marton has designated evidence that points to a genuine issue
> of material fact as to Genentech's adverse employment action against her (negative

performance reviews and, ultimately, termination of employment). Likewise, Marton has designated evidence demonstrating a genuine issue of material fact as to whether those adverse employment actions occurred as a result of her taking approved FMLA leave.

(Filing No. 45 at 33–34.)

Genentech replies that "there is no foundation for Marton's one-sentence argument that she 'has designated evidence demonstrating a genuine issue of material fact as to whether those adverse employment actions occurred as a result of her taking approved FMLA leave,'" and "she does not identify which evidence or which facts support her FMLA retaliation argument". (Filing No. 47 at 18.) The evidence shows that any mistreatment of Marton by Kiff began long before Marton took FMLA leave, and the same mistreatment occurred both before and after the leave.

Upon review of the designated evidence, the Court concludes that Genentech is entitled to summary judgment on Marton's FMLA claim. Marton was given critical feedback regarding communication and teamwork in her annual reviews both before and after she took FMLA leave. Marton received a "partially met expectations" rating in 2013 before taking FMLA leave, and she was given this same rating in 2015 after leave. Kiff was abrasive toward and critical of Marton well before she took FMLA leave in 2015. Marton's FMLA leave entitlement was exhausted on July 27, 2015, and Marton returned to work from her leave almost three months later on October 19, 2015. She then worked more than seven months after her FMLA leave had ended, and more than four months after returning to work, before she was terminated. Kiff was not involved in the decision to terminate Marton, and there is no evidence that any decision maker made negative statements about Marton's FMLA leave. The evidence does not support the conclusion that Marton's termination was motivated by or because of her FMLA leave.

## IV. <u>CONCLUSION</u>

For the reasons discussed above, Defendant Genentech USA Inc.'s Motion for Summary

Judgment (Filing No. 36) is **GRANTED**, and Plaintiff Annette Marton's claims are **dismissed**.

Final judgment will issue under separate order.

    **SO ORDERED.**

Date:  11/30/2020

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Daniel K. Burke
DKB LEGAL LLC
dan@dkblegal.com

Bonnie L. Martin
OGLETREE DEAKINS NASH SMOAK & STEWART
bonnie.martin@ogletree.com